UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUMPVIEW ENTERTAINMENT, LLC, and CAMPUS LIFE PRODUCTIONS, LLC, | : <br> : <br> : |
| Plaintiffs, | :    No. 2:13-cv-03147-CDJ |
| v. | :    Honorable C. Darnell Jones, II |
| CATHERINE SCORSESE | : |
| Defendant. | : |

## AMENDED COMPLAINT

JumpView Entertainment, LLC ("JumpView") and Campus Life Productions, LLC ("Campus Life") (collectively "Plaintiffs), by and through their undersigned counsel, bring the following Complaint against Defendant Catherine Scorsese ("Scorsese"):

### INTRODUCTION

1.  JumpView released its first full length feature film currently entitled "Campus Life" on its website[1] on February 13, 2013. Unfortunately for both Campus Life and JumpView, Scorsese engaged in a concerted effort to undermine the production, distribution, promotion, and overall success of Campus Life and JumpView at inception. Her efforts prevented the successful launch of JumpView and Campus Life.

2.  JumpView was founded by Michael Simon and Kenneth Waddell in 2010 and presents a unique entertainment experience that allows a viewer to choose his or her own adventure and follow a particular character's storyline in a given television show or movie. In

---

[1] http://www.jumpview.com/movie/campus-life/

that same year, Simon and Waddell conceived of the idea for Campus Life as a means to launch and promote JumpView.

3. Waddell, who had a close friendship with Scorsese, brought her in to serve as a co-director of the film. Scorsese agreed to work on Campus Life in exchange for a credit, as well as for a share of certain revenues of the film.

4. From the start of production, Scorsese struggled both creatively and logistically and frequently insisted that her contribution was going unrecognized. Scorsese decided to embark on a campaign to destroy any chance of JumpView, the film and its creators' success.

5. Scorsese decided that the initial agreement was not enough. She alleged that Waddell told her that she was entitled to 25% ownership of JumpView for her work on Campus Life, in addition to the other compensation to which she had already agreed. Waddell contested the allegations, and Scorsese, to demonstrate her unhappiness in not getting what she wanted, tried to choke Campus Life's production and stifled its production, distribution, and promotion any way she could. Scorsese's actions have led to the present lawsuit.

## PARTIES

6. JumpView is a Pennsylvania limited liability company with its principal place of business in Pennsylvania at 328 Tower Lane, Penn Valley, Pennsylvania 19072.

7. Campus Life is a Pennsylvania limited liability company with its principal place of business in Pennsylvania at 328 Tower Lane, Penn Valley, Pennsylvania 19072. Campus Life also refers to the feature length motion picture currently entitled "Campus Life."

8. Catherine Scorsese is a New York resident who lives at 130 Jackson St., Apartment 1C, Brooklyn, NY 11211.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as Scorsese alleges that she has a 25% ownership interest in JumpView, a resident of the Commonwealth of Pennsylvania, with its principal place of business in the Eastern District of Pennsylvania. Scorsese also contracted with and performed work for and on behalf of Campus Life, a company that is a resident of and has its principal place of business in the Eastern District of Pennsylvania. In the course of performing work on behalf of a Pennsylvania resident, Scorsese conducted business in the Eastern District of Pennsylvania and had multiple contacts with JumpView's headquarters in the Commonwealth of Pennsylvania regarding the Pennsylvania-based motion picture with Michael Simon, a citizen of the Commonwealth of Pennsylvania.

## FACTS

11. In August 2010, Waddell and Simon developed the concept for JumpView. JumpView represented a "choose your own adventure" way of watching television and film whereby the viewer could determine which characters to watch and which storyline order to follow. Simon and Waddell began to formulate the storyline for an original film that would fit the JumpView format.

12. In early 2011, Waddell explained the concept of JumpView to his friend Scorsese, who liked the concept. Waddell and Scorsese had a relationship from their New York University Film School days and had worked together on prior projects.

13. Waddell kept Scorsese in the loop when he reached out to mutual contacts he shared with Scorsese from their prior projects. At all of these meetings, Scorsese continuously asserted that JumpView was Waddell and Simon's project.

14. By August 2011, Simon and Waddell had decided to make their storyline into an original film to showcase JumpView's site and player capabilities. This storyline would eventually become Campus Life. Simon and Waddell began to fundraise for this film.

15. Waddell offered Scorsese a role as a producer for Campus Life and told Scorsese that she would receive a percentage of the profits from the film.

16. Waddell, Simon, and Scorsese had a phone conference where the three agreed that Scorsese would join the Pennsylvania-based film as a producer and would receive one-third of the "producer's share." They would each receive the same one-third producer's share and no up-front pay.

17. After unsuccessful fundraising efforts and after unsuccessful attempts to procure original content from existing networks, Simon decided to finance Campus Life.

18. In compensation for Simon's financial stake in Campus Life, Waddell and Scorsese agreed that Simon would receive his producer's share as originally agreed, plus additional compensation offered to investors of the film. This additional compensation entailed the first monies from the film plus 25% until the investment was repaid.

19. On January 9, 2012, Campus Life Productions, LLC was formed as a Pennsylvania limited liability company. Simon is listed as the sole Class "A" manager.

20. The process of producing Campus Life began.

21. Scorsese made numerous promises to Waddell and Simon to "help" the production, but these promises uniformly resulted in additional expenses and disappointments for Campus Life.

22. Scorsese, for instance, offered the use of free studio space to shoot various scenes of Campus Life, but later reneged, resulting in significant cost to the film.

23. Scorsese claimed that her friend Stephen Pope, a stunt coordinator, would work for free, but then Scorsese offered him a back end deal and later insisted that Pope be paid up front for his work, resulting in significant cost to the film.

24. Scorsese offered free grip and lighting equipment from a friend that never materialized.

25. Scorsese promised that actor Ray Liotta would work for free. Liotta ended up working for $500 per day, and Scorsese forced Campus Life to fly both Liotta and his daughter out to set first class and pay for his room at the Essex hotel. These additional expenses cost the production approximately $8,000.

26. Scorsese, moreover, recommended Dave Catalano to be an assistant director for the film and promised him $5,000 in cash, 5% on the back end, and a co-producer's credit, all without consulting Simon or Waddell.

27. Scorsese also personally hired the production designer, Ben Woodward, but complained incessantly about his inexperience, eventually forcing Simon and Waddell to hire yet another of Scorsese's friends, Garry Pastore, who offered to perform the production design work for the production designer credit. However, Scorsese later insisted that Pastore be paid for his work, a request to which Simon and Waddell once again agreed.

28. Filming began at Fairleigh Dickinson University ("FDU"). When Waddell and Simon sought an intern to act as a set photographer and to film behind-the-scenes footage, Scorsese suggested that friends of hers, Cedric Von Sydow and Charlotte Bebin, would do it for free.

29. During production, however, Scorsese insisted that Von Sydow and Bebin both be paid for their services and directed them to withhold all footage. Von Sydow, moreover, filmed a separate promotional video, which Scorsese told Von Sydow to withhold. When Scorsese finally allowed the release of the promotional video, half of the footage turned out to be unusable, and the production had to expend additional money for the actors to come back and reshoot it. To this day, Von Sydow and Bebin have refused to surrender the promotional photos and behind-the-scenes footage for the film.

30. Scorsese's behavior became increasingly erratic and threatening as she felt her contributions were not being appreciated. In the days leading up to the filming, Scorsese repeatedly stated to Waddell, "Keep Michael [Simon] away from me on set or I'm going to kill him." To Simon, Scorsese directly stated, "I'm going to beat the shit out of you before this film is over."

31. Scorsese's nastiness was not just directed to Simon. When one of the actors backed out of the film two weeks prior to shooting, Scorsese left him a threatening voicemail message and then attempted to postpone production for a year due to the casting issue. Scorsese undermined Simon's efforts to increase the offering rate to reel in a bigger name star to replace the actor and demanded that Simon never mention that he was funding the film again because "we all bring contributions to the table."

6

32. Once filming began on June 30, 2012, Scorsese repeatedly showed up late to set. Scorsese continued to berate the art department and made snide comments to Waddell about Simon's good relationship with the actors. At one time, Scorsese attempted to change dialogue in the script mere minutes before the shoot but did not due to actor backlash.

33. When one of the prop trucks was late, Scorsese sent a scathing, profanity-laden email and screamed at Ben Hickernell, a co-producer for the film, for the tardiness. When Waddell approached Scorsese about tempering her reactions to the cast and crew, Scorsese informed Waddell that she would "scream at who [she] want[ed]."

34. Scorsese's erratic behavior culminated when Scorsese called Simon to complain about Ben Woodward and the art department. Scorsese immediately began to curse and threaten Simon when he explained that he had to deal with another emergency.

35. Simon hung up the phone once he arrived on location at FDU. As he exited his car, Scorsese moved towards him with her fists beating the air and continued to scream at him. At one point, Scorsese lifted her right hand in what appeared to be in preparation for a blow, which Simon reflexively blocked by grabbing her wrist, thinking that Scorsese had finally become totally untethered and was going to make good on her promises to beat Simon before the film was complete.

36. Scorsese, truly enraged, threatened to walk off of production and declared that she would take everyone with her. Scorsese ranted about her dislike of Simon, her frustration with the art department, and her feelings that the cast, crew, and producers were not acknowledging Scorsese's efforts and contributions. Shortly thereafter, Scorsese began calling Simon's defensive block of her wrist an "assault" in an effort to garner sympathy with the crew and cast

and in an effort to damage the successful production of Campus Life and the ensuing launch of JumpView.

37. Scorsese made it her mission to undermine the production. Before long, crew members began informing Waddell and Simon that Scorsese and others had attempted to get crew to walk off the production with Scorsese. Scorsese began to rally crew members against Campus Life and JumpView, disturbing the production.

38. Scorsese went further in her attempts to disturb the production. Upon information and belief, Scorsese also called a meeting of the six main actors in the film to tell them that Simon had "assaulted" her while knowing that this assertion was untrue. Scorsese attempted to turn the actors against the production and against Simon and threatened to stop working altogether if Simon returned to the set.

39. In an effort to appease Scorsese and to quell further disruption to production, Simon, acceding to Scorsese's demands, did not return to the set for a film that he was producing and funding.

40. With free reign, Scorsese continued to bleed money from the production. Scorsese went over budget for props by $3,000, despite stating that she would provide "free" props. Scorsese overspent the wardrobe budget by another $3,000.

41. Scorsese then made a grab for JumpView, insisting that she was told that she would receive 25% of the company. When Waddell informed Scorsese that she had absolutely no part of the company, Scorsese threatened to sabotage the cameo scene involving her father, director Martin Scorsese, that had already been organized and was slated to shoot two days later.

8

42. In an effort to film what would be a cameo appearance of the famed director, Simon and Waddell agreed to offer Scorsese a percentage of the *profits* from JumpView, despite the fact that Scorsese had already cost Simon and Waddell over $26,000 in additional monies.

43. This was not enough for Scorsese. Scorsese refused to discuss any issues with Waddell and ex-communicated Waddell and Simon, instead opting to communicate with Waddell and Simon through her agent, Chris Donnelly.

44. Donnelly insisted that Scorsese obtain 25% of JumpView and a co-producer credit, a demand with which Waddell and Simon did not and still do not agree.

45. Upon information and belief, to extort Simon and Waddell to accede to her demand for 25% of JumpView, Scorsese maliciously told the cast and crew that Simon and Waddell had cheated her and that they would not be paid for their services, either. Simon had to expend additional money to placate the cast and crew and prevent them from walking off the set.

46. Upon information and belief, Scorsese further ensured that no one would promote the film. Waddell and Simon were still unable to procure the still photographs of the cast to use as a proper film poster, and when Simon contacted Bebin to ask for the photographs, Bebin indicated that Scorsese was in possession of and had control over the photographs. To this day, Scorsese has refused to provide these photographs to Simon and Waddell. Similarly, Scorsese has refused to yield any of the behind-the-scenes footage shot by Von Sydow.

47. Upon information and belief, Scorsese would not allow her father or Ray Liotta to promote the film and persuaded one of the main actors, Jesse McCartney, to refrain from promoting Campus Life. As a result, Campus Life has not succeeded, and JumpView has not enjoyed the success that it would have with Martin Scorsese, Ray Liotta, and Jesse McCartney all promoting the film.

48. As a final twist of the knife, Scorsese, knowing that she was not entitled to any ownership in JumpView, informed FDU that she was suing Simon and Waddell, prompting FDU to cancel the Premier of Campus Life on FDU's campus, which represented a death blow to the already struggling film.

## COUNT I – CONVERSION

49. Plaintiffs incorporate paragraphs 1-48 as though fully set forth herein.

50. JumpView and Campus Life have possessory rights to the still photographs shot by Charlotte Bebin while filming Campus Life.

51. Similarly, JumpView and Campus Life have possessory rights to behind-the-scenes and other promotional footage shot by Cedric Von Sydow.

52. Without any lawful justification and without Plaintiffs' consent, Scorsese caused Bebin withhold the photographs from Simon and Waddell. Similarly, Scorsese caused Von Sydow to withhold behind-the-scenes footage and other promotional materials.

53. Scorsese, to this day, still exercises dominion and control over the extra footage that Von Sydow filmed for Campus Life.

54. Scorsese's exercise of dominion and control over the photographs and footage that belong to Campus Life and JumpView have resulted in an unreasonable and serious deprivation of Plaintiffs' possessory rights to both the photographs and the film.

55. Such deprivation of Plaintiffs' possessory rights has resulted in damages to Plaintiffs in an amount to be determined at trial, including but not limited to the full value of the behind-the-scenes footage and the still photographs.

56.   Plaintiffs are also entitled to an award of monetary damages, including punitive damages, against Scorsese for her outrageous conduct. Such deprivation of Plaintiffs' possessory rights has further resulted in lost profits to Campus Life and JumpView.

WHEREFORE, for all of the reasons above, Plaintiffs JumpView Entertainment, LLC and Campus Life Productions, LLC respectfully request that this Court find that Defendant Catherine Scorsese unlawfully converted Plaintiffs' property and grant Plaintiffs damages in an amount to be determined at trial; punitive damages; and lost profits in excess of $350,000, plus interest, and such other further relief as this Court may deem just and proper.

## COUNT II - COMMERCIAL DISPARAGEMENT

57.   Plaintiffs incorporate paragraphs 1-56 as though fully set forth herein.

58.   Scorsese made a number of disparaging statements concerning Campus Life, JumpView, and her relationship with the principals of Campus Life and JumpView.

59.   Scorsese made each of these statements knowing that they were false and that they would result in financial harm to the Plaintiffs.

60.   For instance, Scorsese told cast and crew members that they would not be paid for their services, knowing full well that Campus Life intended to pay cast and crew for their work. Scorsese knew such information was false, but spread such falsehoods anyway.

61.   Scorsese's disparaging, false statements proximately caused Plaintiffs to expend additional sums of money to placate cast and crew members.

WHEREFORE, for all of the reasons above, Plaintiffs JumpView Entertainment, LLC and Campus Life Productions, LLC respectfully request that this Court find that Defendant Catherine Scorsese commercially disparaged Plaintiffs and grant Plaintiffs damages in an

amount to be determined at trial; punitive damages; and lost profits in excess of $350,000, plus interest, and such other further relief as this Court may deem just and proper.

### COUNT III – TORTIOUS INTERFERENCE – MARTIN SCORSESE, RAY LIOTTA, AND JESSE McCARTNEY

62. Plaintiffs incorporate paragraphs 1-61 as though fully set forth herein.

63. There were existing, separate contractual relationships between Plaintiffs and each of Martin Scorsese, Ray Liotta, and Jesse McCartney.

64. Upon information and belief, Scorsese interfered with the performance of Martin Scorsese's contract and asked her father not to promote Campus Life, knowing that Martin Scorsese would have done so to fulfill an implied obligation of good faith and fair dealing implicit in his signing the contract.

65. Upon information and belief, Scorsese interfered with Ray Liotta's performance of his contract by asking Liotta not to promote the film, knowing that Liotta would have promoted the film to fulfill an implied obligation of good faith and fair dealing implicit in his signing the contract.

66. Upon information and belief, Scorsese interfered with the performance of McCartney's contract by convincing McCartney not to promote Campus Life as contemplated under his contract.

67. Scorsese convinced these individuals that they should not promote the film or be associated with Campus Life and JumpView.

68. As a proximate result of Scorsese's actions, Plaintiffs suffered a pecuniary loss resulting from her father, Ray Liotta, and Jesse McCartney's unwillingness to promote the film based on Scorsese's interference.

WHEREFORE, for all of the reasons above, Plaintiffs JumpView Entertainment, LLC and Campus Life Productions, LLC respectfully request that this Court find that Defendant Catherine Scorsese tortiously interfered with existing contracts and grant Plaintiffs damages in an amount to be determined at trial, plus interest; punitive damages; and lost profits in excess of $350,000, plus interest, and such other further relief as this Court may deem just and proper.

### COUNT IV – TORTIOUS INTERFERENCE – CHARLOTTE BEBIN AND CEDRIC VON SYDOW

69. Plaintiffs incorporate paragraphs 1-68 as though fully set forth herein.

70. Plaintiffs had an existing contractual relationship with Charlotte Bebin and Cedric Von Sydow. Scorsese interfered with Bebin and Von Sydow's contractual performance by inducing them to withhold photographs and footage in contradiction to their contractual obligations.

71. To this day, Bebin and Von Sydow have steadfastly refused to provide the photographs or footage in violation of their contract.

72. As a proximate result of Scorsese's actions, Plaintiffs suffered a pecuniary loss resulting from Bebin and Von Sydow's unwillingness to provide Plaintiffs with the requested photographs and footage based on Scorsese's interference. As a proximate result of Scorsese's actions, Plaintiffs have been unable to properly promote the film, resulting in a pecuniary loss to Plaintiffs.

WHEREFORE, for all of the reasons above, Plaintiffs JumpView Entertainment, LLC and Campus Life Productions, LLC respectfully request that this Court find that Defendant Catherine Scorsese tortiously interfered with existing contracts and grant Plaintiffs damages in an amount to be determined at trial, plus interest; punitive damages; and lost profits in excess of $350,000, plus interest, and such other further relief as this Court may deem just and proper.

## COUNT V – BREACH OF CONTRACT

73. Plaintiffs incorporate paragraphs 1-72 as though fully set forth herein.

74. Scorsese, Simon, and Waddell entered into a valid oral contract whereby Scorsese would serve as a producer for Campus Life and receive, in exchange, one-third of the producer's share. Scorsese would also act as a co-director for the project. In her role as producer, Scorsese agreed to promote the film and to assist the production.

75. Scorsese breached her oral contract with Simon and Waddell when she actively sought to undermine the film by attempting to stage crew walk-offs, by disparaging Plaintiffs and their principals, by preventing Martin Scorsese, Ray Liotta, or Jesse McCartney from promoting Campus Life, and by preventing Plaintiffs from obtaining promotional materials, including photographs and footage necessary to promote the film properly.

76. Plaintiffs have performed their part of the oral contract unless excused, waived, or made impossible by Scorsese's conduct.

77. As a direct and proximate result of Scorsese's breaches of the oral contract, Plaintiffs have been and will continue to be damaged in an amount to be determined at trial.

WHEREFORE, for all of the reasons above, Plaintiffs JumpView Entertainment, LLC and Campus Life Productions, LLC respectfully request that this Court find that Defendant Catherine Scorsese breached her oral agreement with Simon and Waddell and grant Plaintiffs damages in an amount to be determined at trial, plus interest, and lost profits in excess of $350,000, plus interest, and such other further relief as this Court may deem just and proper.

## COUNT VI – DEFAMATION

78. Plaintiffs incorporate paragraphs 1-77 as though fully set forth herein.

79. Upon information and belief, Scorsese told as many people as she could in the film industry, including cast and crew members of Campus Life, Ginger McCartney, Jesse McCartney's agent, Martin Scorsese, and Ray Liotta, that Waddell, Simon, Campus Life and JumpView were depriving her of 25% of JumpView despite her contributions to the film.

80. Scorsese maliciously spread this lie, knowing that it was untrue and that she was never entitled to any portion of JumpView.

81. Upon information and belief, Scorsese further told as many people as she could in the film industry, including cast and crew members of Campus Life, Ginger McCartney, Martin Scorsese, and Ray Liotta that Simon had "assaulted" her.

82. Scorsese maliciously spread this lie, knowing that it was untrue and that she was never assaulted by Simon.

83. As a proximate result of these untruths, Simon and Waddell's reputations have suffered in the film industry. The negative impact on the reputations of the principals of JumpView and Campus Life has in turn negatively impacted the two companies, which are now viewed with suspicion. Additionally, Plaintiffs and their principals have suffered lost profits and lost opportunities as a result of Scorsese's untrue remarks.

WHEREFORE, for all of the reasons above, Plaintiffs JumpView Entertainment, LLC and Campus Life Productions, LLC respectfully request that this Court find that Defendant Catherine Scorsese defamed Plaintiffs and grant Plaintiffs damages in an amount to be determined at trial, plus interest; punitive damages; and lost profits in excess of $350,000, plus interest, and such other further relief as this Court may deem just and proper.

## COUNT VII – DECLARATORY JUDGMENT

84. Plaintiffs incorporate paragraphs 1-83 as though fully set forth herein.

85. An actual controversy has arisen and now exists between Plaintiffs and Scorsese, whose interests are real and adverse. The issue is ripe for adjudication, as the rights and obligations of the parties are at issue.

86. Scorsese contends that she owns 25% of JumpView and worked to sabotage JumpView when her claim to ownership was contested by Simon and Waddell. Waddell and Simon did not at any point promise Scorsese any percentage of ownership of JumpView.

87. Declaratory judgment is necessary to immediately resolve this dispute and to clarify the rights, titles and interests of the parties which are integral to JumpView's continued performance and existence as a company.

WHEREFORE, for all of the reasons above, Plaintiffs JumpView Entertainment, LLC and Campus Life Productions, LLC respectfully request that this Court declare that there was no agreement between Plaintiffs and Scorsese relating to ownership of JumpView, and such other further relief as this Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs JumpView Entertainment, LLC and Campus Life Productions, LLC pray for judgment as follows:

### **ON ALL CAUSES OF ACTION**

1. For costs of suit; and

2. For such other, further, or different relief as the Court may deem proper.

### **ON THE FIRST THROUGH FOURTH AND SIXTH CAUSES OF ACTION**

3. For general and actual damages in an amount to be determined at trial, plus interest; punitive damages; and lost profits in excess of $350,000, plus interest, and such other further relief as this Court may deem just and proper.

### ON THE FIFTH CAUSE OF ACTION

4.      For general and actual damages in an amount to be determined at trial, plus interest, and for lost profits in excess of $350,000.00, plus interest, according to proof.

### ON THE SEVENTH CAUSE OF ACTION

5.      For a judgment declaring that no contract had ever been formed between Plaintiffs and Scorsese relating to the ownership of JumpView and invalidating any purported claim by Scorsese for any ownership of JumpView.

COZEN O'CONNOR

By: _____
Justin B. Wineburgh, Esquire
Matthew A. Glazer, Esquire
1900 Market Street
Philadelphia, PA 19130
215.665.2000 (t)
215.665.2013 (f)

DATED: June 14, 2013

*Attorneys for Plaintiffs*
*JumpView Entertainment, LLC and*
*Campus Life Productions, LLC*

## CERTIFICATE OF SERVICE

I, Matthew A. Glazer, Esq., hereby certify that on the 14th day of June, 2013, I served a copy of the foregoing Amended Complaint via electronic mail with a copy in the U.S. mail upon the following counsel of record:

Alexander Nemiroff, Esq.
L. Evan Van Gorder, Esq.
Zachary C. Glaser, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1735 Market Street, Suite 3450
Philadelphia, PA 19103-7501

_____
Matthew A. Glazer, Esq.